[Civ. No. 952. Fourth Appellate District.—October 17, 1932.]

CLAUDE HUPP, Respondent, v. GRIFFITH COMPANY (a Corporation), Appellant.

Stearns, Luce & Forward for Appellant.

Noon & Noon and Charles A. Brinkley for Respondent.

BARNARD, P. J.—At the time involved herein the defendant was engaged in paving certain streets in a section of San Diego known as Point Loma. The plaintiff was employed as a truck driver by the Orndorff Company, which company, under an agreement with the defendant, was hauling materials for this paving and also doing such towing for the defendant as might be required. For our present purposes it may be said that Santa Cruz Avenue runs east and west, being intersected at right angles by Santa Barbara Avenue, which runs north and south. It is also intersected by Venice Street, which is a block east of Santa Barbara Avenue, and by Catalina Boulevard, which is a block east of Venice Street. On May 20, 1930, the defendant notified the Orndorff Company that it desired to have a trailer towed from this paving job to the scene of another operation in East San Diego, some ten or fifteen miles away.

The plaintiff, while hauling a truck load of material, was notified of the request and of the fact that another truck sent for the purpose had broken down. Being himself in charge of assigning work to the various truck drivers for the Orndorff Company, the plaintiff dumped his load and proceeded with his truck to the corner of Santa Cruz and Santa Barbara for the purpose of doing the towing required. He there found a trailer belonging to the defendant weighing about seven tons and upon which was loaded a road roller which weighed about twelve tons. The trailer was attached to the truck and the plaintiff was told where it was to go, but was given no instructions as to the route to be followed.

It is conceded that in following the best and most practical route, it was necessary for the plaintiff to first proceed in some manner to the corner of Santa Cruz Avenue and Catalina Boulevard, which corner was two blocks east of the starting point. The main controversies in this case center upon whether, in order to arrive at the corner of Catalina Boulevard and Santa Cruz Avenue, the plaintiff should have taken the direct route east on Santa Cruz Avenue for two blocks, or whether, as a reasonable man, he should have proceeded south on Santa Barbara Avenue for three blocks to Orchard Avenue, then east two blocks on Orchard to Catalina Boulevard and north three blocks on that street to its intersection with Santa Cruz. Santa Cruz Avenue had just been paved, the pavement having been completed and accepted by the city about a week before the date in question. All of the streets in this neighborhood were hilly in nature, the grades ranging from 1½ per cent to 15 per cent. Santa Cruz Avenue for two-thirds of a block to the east of Santa Barbara had a grade of 7 per cent, followed by a grade of 3.8 per cent to Venice Street, then 5 per cent for a third of a block, then 15 per cent for a third of a block, and then 9½ per cent for the remainder of the block, all of these grades being downhill. Beyond Catalina Boulevard the grade of Santa Cruz Avenue was 7½ per cent uphill. The other suggested route, south on Santa Barbara, east on Orchard and north on Catalina, contained thirteen different grades, some uphill and some downhill, the grades ranging from 1½ per cent to 5½ per cent. Santa Barbara and Orchard were not paved.

The trailer which was to be towed had six wheels, two in front and two at each side of the rear, being equipped with a brake on the two left rear wheels only. The evidence indicates that this brake was not on the trailer as originally built, but that it had been subsequently installed thereon. This brake consisted of two wide steel shoes which were pressed against the rubber on the two left wheels when a long lever was pushed down. There was no way of fastening this lever down and the braking force was applied by a man on the trailer, who pushed the lever down and held it as long and as hard as the occasion demanded. It appears that the mechanism operating the brake was made partly from a crankshaft out of a car, with two Ford connecting rods, and there is evidence that the two connecting rods would occasionally buckle.

On the afternoon in question this trailer with its load was standing near the corner of Santa Cruz Avenue and Santa Barbara Avenue, but facing south on Santa Barbara. After it was attached to the truck the plaintiff started forward in low gear, turning almost immediately to the east on Santa Cruz Avenue. An employee of the defendant, named Latham, rode on the trailer for the purpose of operating the brake thereon. While going down the steeper part of Santa Cruz Avenue, between Venice and Catalina and in less than two blocks from the point of starting, the heavy weight of the trailer and roller pushed the rear end of the truck around in a manner commonly called "jack-knifing", with the result that the whole equipment crashed into the curbing, throwing the plaintiff to the ground and inflicting serious injuries upon him. This action which followed resulted in a verdict and judgment for the plaintiff, from which judgment this appeal is taken.

It is appellant's contention that the evidence utterly fails to show any negligence upon its part but, on the contrary, shows as a matter of law, that the respondent was guilty of contributory negligence. This theory is based upon the contention that it conclusively appears from the evidence that the accident was caused by the negligence of the plaintiff in choosing the route over which the equipment should be taken and in driving his truck too fast under the circumstances, and not in any degree by the condition or operation of the brake upon the trailer or by any action on

the part of any employee of the appellant. These two questions are closely related, but will be separately considered, so far as possible.

We think there is some evidence of negligence on the part of the appellant. While we have but briefly described the brake on this trailer, the record contains much evidence which could well have convinced the jury that this brake was entirely inadequate for the control of such heavily loaded equipment over such grades as existed in that neighborhood. An employee of the appellant testified that on previous occasions he had worked with this same trailer, testifying as follows:

"I am familiar with the mechanism of the brakes on that trailer. I know how it is constructed. It works with two Ford connecting rods As you pull down on that lever you clamp the two pieces of steel down on the tires. When the lever is pulled down the two pieces of steel press on the top of the two rear tires. While using that trailer I have had difficulty with the use of the brake. I have had it buckle up with me in pulling down too hard on it. By pulling the lever down too hard you would lose control of the trailer. It wouldn't work. The two Ford connecting rods would buckle right up. The effectiveness of the brake would be lost. I don't remember just the date on which, before Hupp was hurt, the brake buckled up. It happened several times. We generally stopped and fixed it on level ground."

Latham, an employee of the appellant, who operated the brake on the trailer on this occasion, testified that he made no inspection of the brake before starting on this trip, although there was evidence that he had operated the brake a few hours before, when this trailer was being towed to the point where the roller was loaded upon it, and that at that time the brake was not sufficient to hold the weight of the empty trailer as it was being towed over the hills. While there was evidence to the contrary, we are not here concerned with this conflict. Latham also testified that just prior to the accident he used every effort to hold the trailer with this brake, but that the heavily loaded trailer forged ahead and pushed the truck around; that shortly before the accident two bolts on the brake sheared off, and that he let go of the brake and got around behind the roller. While it is

true that he testified that the truck had begun to weave a little from side to side and that its wheels were locked before these bolts on the brakes were cut off, it by no means appears certain that such weaving as the truck did would inevitably have produced the accident, that such weaving was not in part due to the failure of the brake to hold the heavy weight of the trailer and its load, nor that the fact of the shearing off of these bolts or the fact that this employee let go of the brake and sought a place of safety, thus releasing the entire load of nineteen tons, did not have very considerable to do with the accident in question.

While there is evidence that the appellant had instructed its employees that when a trailer and its load was to be moved it was to be taken along streets with little or no grade, and further evidence that the grade on this street was known to these employees to be excessive, the evidence shows that nothing was said to the respondent as to what route should be taken. While the appellant relies on evidence that the pavement on Santa Cruz Avenue was in an extremely dangerous condition because of a slippery curing substance recently applied, the same employees of appellant who testified as to this dangerous situation, and who had been engaged in paving the street, said nothing about it to the respondent.

In view of the fact that the appellant, through its employee, remained in charge of the operation of the brake on the trailer, the condition of this brake and the manner of its operation are important considerations here. Having thus undertaken at least a part of the responsibility for transporting this equipment, we think its failure to in any manner warn the respondent of such dangers of grade and surface as, to the minds of its employees, rendered the route taken too dangerous to be considered, also has a bearing upon the question as to the appellant's negligence. A number of questions of fact are presented, which were for the jury, and its implied finding of negligence on the part of the appellant is, in our opinion, sustained by the evidence.

█ The principal contention of appellant is that the respondent was guilty of contributory negligence as a matter of law, in not choosing a less dangerous route, in operating his truck too fast, and in locking the brakes thereon. It is argued that the respondent had knowledge

of all of the streets in this vicinity and that his selection of this particular street was negligence because it included the steepest hill in the neighborhood and because there had been freshly applied thereto a slippery curing substance, which fact was known to him. In regard to the selection of the street, the respondent testified as follows:

"I selected Santa Cruz Street to go down. That is where the accident happened. There are other roads in that vicinity a whole lot steeper. Narragansett would be, I believe, if I went that direction. Narragansett would have been in back of me. Del Monte has a 14% grade about two hundred feet, that is, about straight down. At the same time, this street from Santa Cruz Street to Orchard Street was all torn up and had just been refilled where they put in pipes along there, and in going along there with a truck you had to be very careful you did not hit one of those places or you went down clear to the axle. It was the same way on Orchard Street. If I dropped this trailer in there with this load, there would have been lots of fun taking it out. To the best of my knowledge, that was the condition of Santa Barbara Street and Orchard Street at the time I started moving the trailer. At the time of the accident I knew it was that way. That is one reason I picked out the paved street. I know that I picked out a paved street because I helped put that paving in there and hauled the material for Santa Cruz. At the time I did not know I picked out Santa Cruz Street. They told me that is where the accident happened. As far as that is concerned, that is all I know about it. I knew all the time I was working out there that Santa Barbara Street was soft in sections down toward Orchard Street. I could not say the exact spot, but between Santa Cruz and Orchard there were soft places and also on Orchard between Santa Cruz. There were soft places between Santa Cruz and Del Mar and Santa Barbara Street. They were all along between Santa Cruz and Del Mar. I know that because I helped to pull trucks out of there that were stuck there. It was three or four days or a week before this accident that I pulled a truck out of there. I helped pull three or four trucks out of there to the best of my knowledge. That was before the accident—sometime after we started the job until the accident happened. To the best of my knowl-

edge, the soft part between Coronado and Santa Cruz started at the property line on Santa Cruz and continued clear down.''

All of the streets in that neighborhood contained grades ranging from 1 or 2 per cent up to 13 per cent, 14 per cent and 15 per cent, the latter grade being found on this one-third of a block on Santa Cruz Avenue. The question now before us is whether it can be said that a reasonable man could draw but one conclusion from all of the evidence and that to the effect that the respondent was negligent in proceeding down Santa Cruz Avenue. While it appears that the route now advocated by the appellant, which was six blocks longer than the one chosen, had less percentages of grade, the respondent's evidence indicates conditions thereon which might well have made him prefer a shorter paved street over which to take this heavy load. There were other possible routes in between, but these were from two to six blocks longer, required a zigzagging course, and the only one which was over a paved street had one grade of 13 per cent. The street chosen was the direct route, it was paved, it had been open to the public for traffic for about a week, it was only two blocks long, and the steep part of its grade was only a third of a block long. The respondent testified:

''There were down grades any way you would go to get to the Cooper Street job. San Diego is made up of hills. You have to go down hill to get any place you want to go of any distance. Catalina Boulevard was as steep as Santa Cruz and Santa Barbara Street. From the Naval Training Station garage on Catalina Boulevard to where you go down to the tide flats is very steep and if you went out University, going down underneath the Florida Street bridge, it is very steep, and you have two more hills, Arizona Street and Texas Street. If you went out El Cajon Avenue, you had a steep hill to pull up to El Cajon and two hills to go down to Florida Street and two more hills down in that direction. To the best of my knowledge, from Catalina Street you would have had steep hills. If I had arrived at Catalina Street safely I would have had other steep hills before I arrived at the job.''

He further testified that he was familiar with Santa Cruz Street, and knew ''approximately its grade and how it sloped''. In this journey many hills of varying grades

were to be encountered. Might not a reasonable man expect a trailer, whose brake was in charge of another, to be equipped with brakes sufficient for any reasonable grade? Was this a reasonable grade? Would a reasonable man prefer for such a load a short paved street instead of a longer, unpaved road, partly in bad condition? Could the respondent have reasonably believed that this paved street, opened for traffic, and with its steep portion only a third of a block long, would be safe if the trailer was properly equipped with brakes and properly handled? These, and many other questions that might be suggested, are questions of fact. If it could ever be fixed, as a matter of law, at what point a grade becomes too steep for a given load, we have here a complication suggested by the responsibility of another for the condition and manner of operation of the equipment containing the larger share of that load.

In regard to the slippery condition of the street, while the respondent testified that he knew that the street was paved with concrete, he also testified that he did not remember having noticed any curing substance on the pavement, and that he did not remember having been over the street since the paving was completed. While the record contains evidence that an oily and slippery curing substance was on the pavement, there is other evidence to the contrary. A motorcycle officer who accompanied an ambulance to the place of the accident, testified as follows: "The pavement may have been concrete with a black curing process on it. I know it was black pavement, that is all. I thought it was asphalt. It was dry. I don't believe the oil, or material on it, whatever it was, could be slippery. I know it was a perfectly dry pavement and it had been done for some time; it should have been cured." A question of fact arises both as to the presence of an oily and slippery substance and as to any knowledge thereof on the part of the respondent.

As to the claim that the respondent drove too fast and improperly locked his brakes, the witness Latham testified as follows: "When we got around the turn and started down Santa Cruz I don't know how fast the truck was going. We started out rather fast and we slowed down some when we got to the hill until the time we got to the intersection. We were going probably fifteen miles an hour,

After that it slowed down some.'' On the other hand, the respondent testified that when he started out he placed his truck in low gear and that he remembered nothing thereafter. When the truck was found after the accident it was in low gear. There was evidence that this truck could not travel more than two or three miles an hour while in low gear. Appellant relies upon the following testimony of respondent as showing that he was negligent in the operation of his truck on this occasion:

"So I had approximately nineteen tons behind me. My truck was empty. I have had experience in towing these heavy weights. When I have an empty truck towing nineteen tons behind me my traction is not as good as though the truck was loaded—in fact the truck would weigh about six tons empty. I know that it is dangerous to tow a heavy weight of that kind at any speed greater than a low speed. I also know that it is dangerous to go down any kind of steep hill with that kind of a load. I also know that with the equipment I had that day in the trailer if I applied my brakes sufficiently to lock my back wheels, it probably would cause the heavy trailer behind me to swing the back end of my truck around and 'jack-knife' it. When I lock my wheels or when the wheels of my truck are locked it is very difficult to control it with the weight behind it of nineteen tons. It would be liable to cause it to swing or weave. The moment the truck and trailer got out of alignment, it would be almost impossible to hold it if I let it get out of my control.''

Not only is a question of fact presented as to whether or not the truck was being operated too fast, but another arises as to when the wheels of the truck became locked and the relation thereto of what was occurring on and in connection with the heavily loaded trailer, and all this must be considered in connection with an apparently great emergency. It cannot be held that negligence on the part of the respondent, as a matter of law, is conclusively established by the fact that at one time during its course down the hill, the wheels of the truck were locked.

An important part of the question before us, is whether the respondent's negligence, if any, proximately contributed to the accident. While appellant argues that it is perfectly clear from the evidence that the cause of the accident was

the extreme steepness of the grade on a street wrongfully chosen by the respondent, there is evidence in the record which justifies the jury in reaching a different conclusion. Latham, who was operating the brake on the trailer, testified as follows:

"When we got to the 15% pitch where it broke sharply down we just kept on going. The first thing that happened that indicated any trouble or accident was that about a third of the way down the hill, or possibly more, the truck began to swing a little bit. Both wheels of the truck were sliding. At that time the brake was still operating and functioning on my trailer. The bolts had not broken at that time. When the wheels began to slide on the track it weaved a little bit and finally ran in and nosed around. By that I mean it swung around in the opposite direction. I don't recall at just what period the bolts broke but I am sure it was after the truck began to weave and after the wheels on the truck were sliding. At some period after that the bolts sheared away . . . The effect upon the truck when its wheels began to slide was that it weaved a little bit. I don't know any more than to say that it just weaved and turned around. I suppose the wheels on the truck locked from having the brakes applied. I don't know. They were not turning around. I suppose the nineteen tons coming behind shoving this truck with the wheels locked simply shoved against the rear end and shoved the rear end forward and the front end swung around. During all this period I was applying my brakes to the utmost. The brakes held. There was no defect in their operation or in their ability to control the trailer until after the truck swung around."

While he says the bolts broke after the truck began to weave and that later the truck turned around, the inference is possible, especially in view of the evidence as to the construction and method of operation of the brake on the trailer, that this brake was applied only on one side of the trailer, and that it had been insufficient to hold the trailer, when empty, on the same day, that the route chosen would have been safe had the braking equipment on the trailer been sufficient and properly operated, and that any improper operation of the truck, by respondent, may have been caused by his efforts to meet conditions

which were chargeable to the appellant. It may well have been that while the respondent was endeavoring to meet these conditions as best he could, the shearing of the bolts or the dropping of the lever by Latham, as he sought safety, may have released the heavy mass which then rushed down the hill and turned the truck around. The motorcycle officer above referred to, testified that when he examined the trailer immediately after the accident "there were six· or eight bolts which held that plate down, and those bolts were either so loose or broken that when the lever was brought completely down as far as it would go, there was some obstruction on the body of the truck which stopped the lever, and when it was brought clear down to the limit of the movement, those iron shoes that normally rub on the tires did not exert· any pressure on the tires whatever". Latham testified that he supposed the nineteen tons coming behind shoved the truck around. The question naturally arises whether this would have occurred had the brakes on the trailer been adequate or had they been properly operated. In this connection, while Latham here testified that the brakes held, at another time he testified in reference to the same time, as follows: "When I applied the lever to the brake to try and hold the trailer back I stayed on the trailer at all times and held the lever down all the time until the truck came to a stop." At still another time he testified that he changed his position on the trailer "as we were going down the hill. I got behind the roller so I would be out of the front of it. I let go of the brake and got behind the roller."

Not only in relation to the operation of the truck and trailer as they proceeded down the hill, but also in regard to the responsibility of the appellant for the condition of the brake upon the trailer, in connection with choosing the route to be traveled, and in reference to warning the respondent as to hazards to be there found, there are questions of fact affecting the question of proximate cause, which make it impossible to say that the only inference possible is one unfavorable to the respondent.

It would serve no useful purpose to analyze the many cases cited. The general rules as to contributory negligence and proximate cause are well settled, and there is no controversy between the parties hereto as to what these rules

are.  Under these rules and the facts shown we think the question of contributory negligence as a proximate cause of this accident was one of fact for the jury.

■ Appellant next complains of the refusal of the trial court to give three specific instructions.  The only argument made is that the instructions in question were correct statements of the law and that they were applicable to the defendant's entire defense.  The first of these instructions assumed a fact not in evidence.  In general, it related to the degree of care required in connection with the dangers and risks involved, with a specific application to some of the facts in this case.  The degree of care necessary, as applied to the circumstances of the case, was covered in another instruction given.  The second instruction assumed that the respondent was in control of the entire equipment, and that the appellant owed no duty in reference to the choice of a route over which the equipment should be transported.  It also told the jury that the respondent was bound to use a safer and less dangerous route than the one taken, if one existed.  This would not be true if the route taken was such as a reasonable man might have taken, and this portion of the instruction left out of consideration the possible effect of the condition and manner of operation of the trailer upon the choice of a route.  The correct portion of the instruction was elsewhere covered.  The third instruction complained of went only to the degree of care required, a matter that was fully covered.  We have examined all of the instructions given and refused, and find no error therein.

■ The only other point raised is that the amount of the verdict, $21,500, is excessive.  This is based upon the contention that the respondent was not shown to have been permanently injured.  There was evidence of very serious injuries.  The respondent was unconscious for several days and remained in the hospital from May 20th to August 5th.  The doctor who attended him testified as follows:

"He had a depressed skull fracture on the right side, back of his ear, a fracture of his right shoulder blade, and numerous abrasions and contusions.  The serious injury was the brain injury.  This hole in his head was about nearly an inch in diameter and very nearly circular, and the bone which was missing in this region was shattered into a number of pieces which were pushed down into the

brain substance about one inch. There was a good deal of brain substance lost, oozing out of the opening, and some of it had to be removed and probably some of it had already escaped, so it is impossible to say just how much brain tissue he lost. On account of the fact that he was in a good deal of shock at that time, I didn't operate on him until the following morning. Then I did what we call a trephine operation. That is, I removed . . . I enlarged this opening in his skull and had removed all the bone which had been pushed down into the brain substance. He got along quite well and stayed in the hospital about ten weeks, I think it was, until the 5th of August, when he left the hospital. When I say that he got along well I mean that he recovered promptly as far as any danger to his life was concerned, but his brain don't work right. He had, after a few days, when he began to talk and began to remember where he had been and what had happened, he would miss certain words when he would attempt to talk, and he would have to go back and try several times in order to get some word that he couldn't quite make . . . get at, when he was trying to talk. The same thing happened in his reading, when he would read the newspaper, he would read a whole paragraph and then be unable to tell what it had been about, and frequently he would be unable to recognize some of the ordinary words with which he should have been perfectly familiar.''

There was evidence that the fracture of his skull extended over to his nose and necessitated the extraction of four or five teeth. The respondent was unable to work at the time of the trial, fourteen months after the accident, and was still suffering from headache and dizzy spells. The doctor further testified:

''As to his future outlook, ultimate recovery, I think it is more or less of a problem as to what the future is going to bring for him. A brain injury is a very serious thing, especially when some of the brain has been lost. This injury wasn't only an injury at this side here, back of his ear where the depression was, but also there was a fracture which ran from that point clear down under the base of the brain, a long, what we call a linear fracture, that is a line fracture extending into the base of the skull, and there may be injury to other parts of the brain as well as

the part of the brain that was under the depression. In my opinion I believe the man is unable to work at the present time and I cannot say how long he is going to be in that condition. That may be a very long time or may clear up in a few more months. I wouldn't express any opinion as to the length of time he is going to be disabled, his condition is liable to continue for an indefinite period of time. He's been in the same condition now for practically a year and shows no signs of improvement during that time. He tires out just as quickly and gets these headaches and these dizzy spells and his double vision just as much now, apparently, as he did at that time a year ago.''

On cross-examination, the doctor testified that he was unable to say whether he might recover or not. There was evidence that at the time of the accident the respondent was earning $150 per month, and the special damages proved amounted to $3,100 for medical expenses and loss of income up to the time of the trial. The respondent was forty-one years of age at the time of the accident, and his condition at the time of the trial was about the same as when he left the hospital. While there is no direct testimony that the injuries would certainly be permanent, the inference is reasonable that they would be long continued if not permanent. The evidence would justify a very substantial judgment and we are unable to hold that the amount found by the jury indicates passion or prejudice. Under the familiar rule, we think this verdict cannot be set aside as excessive.

For the reasons given the judgment is affirmed.

Marks, J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 14, 1932, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 15, 1932.